*ALBANY, August, 1808.*

Griswold
v.
New-York Ins.
Company.

## Griswold and Griswold *against* The New-York Insurance Company.

THIS was an action on a policy of insurance, on the *freight* of the ship *Culloden*, valued at 3,300 dollars, on a voyage " at and from *New-York* to *Barcelona*, with liberty to touch at *Gibraltar.*"

The cause had been once tried, when the jury found a verdict for the plaintiff, and on a motion for a new trial, of which, the cargo, consisting of flour, was so much damaged, that had it been carried to its place of destination, it would not have been worth the freight. Information of the accident was given to the insurers, on the day it happened, and two days after, the insured abandoned as for a total loss. The vessel was repaired, and in a capacity to prosecute the voyage in seventeen days, and at an expense of about 150 dollars. The cargo, which was insured by others, had also been abandoned, and was accepted by the underwriters, and sold at auction, at a loss of about 27 per cent. It was held, that the insured on the policy on freight, had no right to abandon, but ought to have offered to the owners of the cargo to carry it to its place of destination, so as to entitle themselves to the freight. The acts of the agent of the insurer, in saving of the cargo, and being present at the unlading and delivery, will not amount to an acceptance of the abandonment, or justify the inference that the insurer consented to the breaking up of the voyage.

Where goods are carried to the place of destination, though spoiled so as to be of no value, the owner cannot abandon the goods for the freight, but the master is entitled to his full freight for the transportation of the goods.

*Insurance on freight from New-York to Barcelona. The vessel, in going out of the harbour, and while proceeding on the voyage insured, was stranded, in consequence*

ALBANY,
August, 1808.

Griswold
v.
New-York Ins.
Company.

the verdict was set aside, and a new trial granted. ( *See* *vol.* 1. *p.* 205.)

On the *second* trial, at the sittings held in the city of *New-York*, in *June*, 1807, before Mr. Chief Justice Kent, the jury found a *special verdict;* on which the cause was argued at the last term by

*Wells* and *Radcliff*, for the plaintiffs, and

*Hoffman* and *Harison*, for the defendants.

The material facts found by the special verdict, and not stated in the former case were,

1. In consequence of the vessel's stranding, the whole of the cargo, which consisted of 2,300 barrels of flour was damaged by the sea-water, except between 100 and 200 barrels on the upper tier. The whole of the flour so damaged, was so much wet and spoiled as to be totally unfit to be reshipped for that, or any other voyage ; and if it had been reshipped and carried to its port of destination, it would have been worth nothing, on its arrival there ; that if the part which was not wet and damaged, had been reshipped with the rest of the cargo in its damaged state, it would have become heated, and more or less spoiled ; and that no prudent person would have taken the cargo as a gift, subject to the expense of the freight to *Barcelona.*

2. That on the 3d *March*, 1804, being the day on which the vessel grounded, in going out of the harbour of *New-York*, the plaintiffs sent a written notice of the accident to the defendants, to which the president of the company replied, " very well, I have sent for captain *Kermit*." A similar notice of the situation of the vessel was given by the plaintiffs on *Sunday*, the 4th *March*, and an abandonment made on the 5th, which was repeated on the 7th of the same month.

In their letter of the 5th, the plaintiffs say, " if you are of opinion that the cargo is bound to pay any freight, it will be for your interest to give directions that the cargo be not delivered to the shippers or underwriters on the cargo, until the freight may be settled. There is a sloop,

with some flour on board, taken from the ship, it is necessary that some orders should be given for discharging the flour."

On the 10th *March*, the defendants informed the plaintiffs, that their taking charge of the ship should not prejudice any claim they had on the defendants for freight.

3. That in consequence of the disaster, the voyage was broken up, and its further prosecution relinquished.

4. That before and after the abandonment, the agent of the defendants, who was one of the directors of the company, and an agent of *The Commercial Insurance Company*, by whom the cargo had been insured, were on board, and superintended and directed the unloading of the ship, and employed persons for that purpose.

5. The vessel, after being repaired, did not proceed on her voyage, but was sold by the plaintiffs some time after the 10th *March*, 1805, for their own benefit.

6. That it is the uniform practice in the city of *New-York*, where flour shipped for exportation, is damaged and relanded, that it is always sold, without delay, to the consumers, and is never reshipped.

7. That after the accident, the mate of the ship applied to the plaintiffs for their directions, who informed him, that he must take his orders from captain *Kermit*, (the agent of the defendant,) and the mate accordingly acted under the directions of *Kermit*, and assisted in delivering the cargo to the *Commercial Insurance Company*.

8. The ship was repaired, and ready to take in a cargo in seventeen days after the accident, at an expense of about 150 dollars.

9. That previous to the delivery of any part of the cargo from the ship at *New-York*, the plaintiffs, or one of them, in a conversation with one of the directors of the *Commercial Insurance Company*, and acting in their behalf in relation to the cargo, consented that the cargo should be received by the said company; that there was no communication between the defendants and the *Commercial Insurance Company*; but *Kermit*, who was the agent of the

defendants, knew that all the cargo was delivering to the *Commercial Insurance Company*, and made no objection.

10. That it is usual for the different *Insurance Companies*, to employ persons, who are called inspectors, to examine and report the condition of vessels ; and in case of damage or accident to any property insured, to give directions, and to aid and assist in its preservation ; and that *Kermit* acted in this character for the defendants ; and one *Whitlock* for the *Commercial Insurance Company* ; but they had no power to bind the company to accept an abandonment.

11. That about 900 barrels of the flour were taken out at *Long-Island*, and the residue at *New-York* ; and one of the plaintiffs was frequently at the ship while unlading at *New-York*.

*For the plaintiffs*, it was contended, that it was a settled principle of the law of insurance, that whenever a voyage is broken up, or defeated by any of the perils insured against, the insured has a right to abandon ; that by the facts in the present case, it was manifest that the voyage was wholly defeated ; for if the cargo had been reshipped, and sent to its port of destination, it would inevitably have been so much deteriorated, as not to be worth the freight. It was found to be the invariable usage never to reship damaged flour. There was then such a destruction of the cargo, as wholly to defeat the object of the voyage. It would be unreasonable to oblige the insured to send on a cargo in a perishable state, and which would certainly be worth nothing at the port of delivery. That the vessel was repaired and ready to carry freight, could make no difference, if there was no cargo to be carried. There must be a cargo as well as a ship, for *freight* is the joint result of both. If the cargo had, from necessity, been thrown overboard at sea, and lost, no freight would have been earned, and the defendants would have been liable. There was, then, no difference whether the goods were absolutely and totally lost by the perils of the sea, or so much damaged as to be worth nothing at the port of destination.

If the owner of the goods had a right to abandon them to the insurer, the plaintiffs had a right also to abandon the freight. Every commercial enterprise is made with a view to gain, at the port of destination. That is the object the owner intends to insure. Now when there is a moral certainty, and it is found as a fact, that the goods would be of no value at the destined port, why compel the insured to carry them, or to do a useless and nugatory act? An offer to carry on the cargo, under the circumstances of the case, would have been an idle ceremony, nor were the plaintiffs bound to make such offer. But if they were, the offer was, in effect, waived by the acts of the defendants. Though cautioned as to the delivery of the cargo, until the freight was secured, the defendants acquiesced, in its delivery to the *Commercial Insurance Company*. The plaintiffs had a right to assist in saving the vessel and cargo, without prejudice to their claim on the defendants; indeed, it was a part of their duty, and cannot be construed a waiver of the abandonment.

Again, if the flour had arrived at *Barcelona*, the owners might have abandoned it for the freight. The rule was so laid down by Lord *Mansfield* in the case of *Luke* v. *Lyde*.* It was admitted to be the rule, by the counsel in a prior case, *Lutwidge* v. *Grey*,† and has been recognised in the subsequent case of *Baillie* v. *Moudigliani*.‡

*Valin*, in his commentary on the marine ordinance of *France*, maintains the justness of this rule.

In the case of *Frith* v. *Barker*,§ this court decided, that where sugar had been washed out of the hogsheads, which had fallen to pieces, no freight was due. There is, in reason, no difference between that and the present case, where the flour, if it had arrived at *Barcelona*, would have been worth nothing. The rule is not only just, but it is founded in good policy, as the master is thereby interested to take better care of the goods, when he knows that his freight is made to depend on their arriving in good order. On a similar principle of policy, seamen's wages are made to depend on the earning of freight.

* 2 *Burr.* 886.
† *Abbot*, 234. 239.
‡ *Park*, 53.
§ 2 *Johns.* 327.

*For the defendants*, it was argued, that there was no substantial difference between the special verdict and the case formerly before the court; and that if there was any difference, it was in favour of the defendants, for it was found that the plaintiffs did assent to the delivery of the cargo to the *Commercial Insurance Company*. Part of the cargo was delivered at *Long-Island*, and before the letter of abandonment on the 7th *March*. By delivering a part, the *lien* of the defendants, in case of an abandonment, was impaired. *Kermit's* authority extended no farther than to take care of the property; he could not bind the defendants. Indeed, as a corporation, they cannot be bound, unless by an express authority. Notwithstanding the usage as to selling damaged flour, still the plaintiffs might have insisted that the freight should be first paid out of the sales.

But the material question was, whether, admitting the cargo to have arrived at *Barcelona*, in its damaged state, the owner could have abandoned it for the freight?

The case of *Luke* v. *Lyde*, amounts to no more, than that such an abandonment of the goods may be made at an intermediate port, into which the vessel has been forced by necessity. The precise question now before the court has never been decided in *England*.

This is evident from the observations of Mr. *Abbot*, who has stated the different cases, and the opinions of foreign jurists; and it is obvious, that his opinion is against the rule contended for on the other side.

The opinion of *Pothier*, which is contrary to that of *Valin*, is far more rational and just, and is founded on the nature of the contract between the master and the merchant. When the master has carried the goods to the destined port, he has performed his undertaking, and is entitled to the stipulated reward for the service. He has nothing to do with the soundness or value of the goods. Nothing will prevent a ship from earning freight, but an incapacity to prosecute the voyage, or the absolute loss of the cargo, by the perils of the sea.

Again, the insurer has no concern with the *manner* in which the freight is paid ; and if it is admitted, that the owner of the cargo might have abandoned it at *Barcelona*, for the freight, then it would follow, that the goods would be substituted as a payment of the *freight*, and so the plaintiffs would have no right of action against the defendants for a loss of freight.

KENT, Ch. J. delivered the opinion of the court. The only material difference between the special verdict before us, and *the case*, which was made upon the former trial of this cause, is respecting the extent of the damage to the flour. It is now found that all the flour, except between 100 and 200 barrels, became damaged, and wholly unfit to be reshipped, for that or any other voyage, and that if the damaged flour had been carried to *Barcelona*, it would have been worth nothing there, and would have injured the sound flour, and that no prudent person would have taken the cargo as a gift, and carried it, subject to the expense of the freight. But it is also found, that the whole cargo was sold at *New-York*, at a loss of only 25 or 27 per cent, which was, of course, more than double the amount of the freight.

These facts do not appear to vary in any degree the application of the principles laid down by the court in the former consideration of this cause. When the plaintiffs abandoned, on the 5th of *March*, they had a cargo in charge worth more than double their freight. The ship was in a condition to be immediately and easily repaired, and in 17 days she was repaired, and ready for sea. If the plaintiffs, instead of abandoning to the defendants, had offered to proceed with the cargo, and the owners of it had refused, they would have made themselves liable for the full freight. If the owners had consented, the plaintiffs would have been bound to proceed, and run the risk (against which risk the defendants had assured by the policy) of losing the freight by the loss of the cargo, in the course of the voyage, or of earning freight by its

ALBANY,
August, 1808.

Griswold
v.
New-York Ins.
Company.

safe arrival and delivery at the port of destination. How does it appear that freight could not have been earned? For the plaintiffs to abandon without assuming this risk, was unreasonable and inadmissible. It would, no doubt, have suited very well with their convenience to have received the full freight for the voyage, without ever leaving the port of *New-York*, and to have employed the time which that voyage would have consumed, in earning freight on some other. But they cannot be permitted to enjoy this good fortune, unless they can show clearly that the freight insured was lost, either by the act of the shipper, or by the perils of the sea. Whether it would have been wise or foolish in the shipper, to have sent on the flour, in the condition it was in, was a question not to be put by the plaintiffs. It was none of their concern. The risk of the value of the cargo at the port of delivery lay with the owners of the cargo. All that the plaintiffs had to do by their contract, was to provide the means to take on the cargo, by repairing their ship, or procuring another.

But it is said, that the cargo, if carried on to *Barcelona*, would not have been worth the freight. This is the import of the special verdict. Here, then, the question arises, whether the plaintiffs would not have had their remedy against the shipper, personally, for any deficiency in the freight, or whether the owners could discharge themselves completely, by abandoning the damaged cargo to the plaintiffs, after its arrival at *Barcelona*.

This question has not, hitherto, received any judicial decision in the *English* courts ; and it has been frequently mentioned in this court as a point unsettled. We are, therefore, called to examine the question upon principle, and upon the authority of the marine law of foreign states.

The contract of affreightment, like other contracts of letting to hire, binds the shipper personally, and the *lien* which the ship-owner has on the goods conveyed, is only an additional security for the freight. This *lien* is not

incompatible with the personal responsibility of the ship-per, and does not extinguish it. The consideration for the freight, is the carriage of the article shipped on board, and the state or condition of the article at the end of the voyage has nothing to do with the obligation of the con-tract. It requires a special agreement to limit the remedy of the carrier for his hire to the goods conveyed. It cannot be deduced from the nature of the undertaking. The ship-owner performs his engagement when he carries and delivers the goods. The condition which was to pre-cede payment, is then fulfilled. The right to payment then becomes absolute, and whether we consider the spirit of this particular contract, or compare it with the common law doctrine of carrying for hire, we cannot discover any principle which makes the carrier, an insurer of the goods as to their soundness, any more than he is of the price in the market to which they are carried. If he has con-ducted himself with fidelity and vigilance in the course of the voyage, he has no concern with the diminution of their value. It may impair the remedy which his *lien* afforded, but it cannot affect his personal demand against the shipper. This conclusion appears to be so natural and just, that I cannot perceive any plausible ground upon which it has been questioned or denied. The weight of authority is certainly on this side. The *French* ordinance of the marine (*tit. du Fret*, art. 25.) is explicit to the point. This code is not only very high evidence of what was then the general usage of trade, but from its com-prehensive plan, and masterly execution, it has long been respected as a digest of the maritime law of all the com-mercial nations of *Europe*. *Valin*, in his commentary upon this ordinance, calls in question the equity of the rule ; but his reasoning, when we apply it to the true construction of the contract, is weak and superficial ; and it has been exposed and answered, and the solidity of the rule vindicated, by a superior and more luminous jurist. (*Valin*, tom. 1. 670. *Pothier, Charte-Partie*, No. 59.)

* Mr. Justice
Livingston.

But though this question has never been settled at Westminster-Hall, Mr. Abbott (p. 243.) says, that the assumed right to abandon deteriorated goods, at the port of discharge, is not, in point of practice, claimed in that country, and his opinion is evidently in favour of the rule, as established in France. We have, however, the opinion of Lord Mansfield against it, according to the report of the case of Luke v. Lyde; and if we were certain of the accuracy of that part of the report, and that the observation was intended to apply to the very question before us, we ought to pause even over the dicta of so pre-eminent a judge. We cannot, however, bend our convictions to a mere extra-judicial saying, and when this cause was formerly before us, the weight of this dictum was greatly diminished by the judicious reflections of one of the judges of this court,* who has since been elevated to the bench of the United States.

The acquiescence of the defendants in the breaking up of the voyage, and the abandonment of the freight, have been urged to the court as facts, better supported by the special verdict, than they were by the case made. There does not, however, appear any material alteration of the cause in this respect, and there is nothing which gives sufficient colour for such an inference. The acts of Kermit, the agent of the defendants, relative to the delivery of the cargo to the Commercial Insurance Company, went no further than was requisite to the unloading and repairing of the ship, of which the defendants were also the insurers. Every act is referable to that object. The assent of the defendants ought to have been found as a positive, substantive fact, if it ever existed. It would be unjust to infer it from acts capable of a different explanation, and which at most were but equivocal.

The court are, accordingly, of opinion, that judgment must be rendered for the defendants.

Judgment for the defendants.