By the Court. Hoffman, J.
There are two points of view to be taken of this case: one—and it is that principally argued by counsel—arises upon the general law, irrespective of the particular language of the bill of lading in this instance; the other depends upon the true construction of that language.
In the first aspect, the question raised is this: If a liquid (molasses) be shipped in hogsheads, under a bill of lading, in the usual form, viz., for the delivery of so many hogsheads of molasses, and the casks be well stowed, and without perils of the sea, or fault of the ship-master or owners, some of the casks be found empty, from leakage, is freight payable for such empty casks ?
It is said, under the second view of the case, that there is here no engagement, except to give so much share in th.e ship as the barrels would occupy, whether filled with molasses, with sea-water, or empty; that, although the freight is to be computed as if they were filled to the brim with molasses, yet it is earned, if the barrels only are delivered.
It is also insisted, and the observation appears to be warranted, that this first question has not been decided, in our own tribunals, nor in those of England.
Chancellor Kent, in his Commentaries, (vol. 3, p. 226,) says : “If casks contain wine, rum, or other liquids, or sugar, and the contents be washed out, and wasted and lost by the perils of the sea, so that the casks arrive empty, no freight is due for them; but the ship-owner would still be entitled to his freight, if the casks were well stowed, and the contents were essentially gone, by leakage or inherent waste, or imperfection of the casks.”
Apparently, the last clause of this proposition is directly opposed to the last clause of the 310th article of the Commercial Code of France. The whole article is this: “ The merchant cannot abandon, for the freight, goods which are diminished in value, or damaged, from defect or by accident. If, however, casks, containing wine, oil, honey, and other liquids, have leaked out, so much that they are empty, or nearly empty, such casks may be abandoned, for the freight.”
Chancellor Kent cites, in support of his proposition, Molloy, (b. 2, c. 4, § 16,) and Frith v. Barker, (2 John. Rep. 327.)
What Molloy states, as a positive rule, is, “ that if one hundred tons of wine are freighted, and twenty leak out, so that there is not *543 above eight inches from the bung upwards, yet the freight becomes due. One reason is, that, from that gauge, the crown becomes entitled to custom. But, if they be under eight inches, by some, it is contended to be in the election of the freighters to fling them up, to the master, for the freight, and the merchant is discharged. But most conceive otherwise; for, if it had all leaked out, and if there were no fault in the master, there is no reason that the ship should lose her freight, for the freight arises from the tonnage taken.”
Frith v. Barker settled that, if a portion of a cargo of sugar was washed out, by reason of the perils of the sea, so that some of the casks arrived empty, no freight is payable for such empty casks. Bringing into port the empty hogsheads, is not bringing the hogsheads of sugar, which the owner of the vessel had undertaken to do. The goods no longer exist. “This opinion,” says Chief Justice Kent, “ is strictly confined to the facts of this case, which establish that the sugar was entirely gone, by the perils of the sea, before the arrival of the vessel in port. It will not, therefore, apply to the case of an article that is lost, by other causes than the perils of the sea, such as internal decay, leakages, evaporation, and the like.”
Clearly, therefore, the court left such a case uncontrolled by the opinion and judgment, and open, in like manner, as it had left nearly the same question, stated in the first sentence of the opinion. So the reporter understood the subject, as he puts the proposition in the shape of a query.
Griswold v. The New York Insurance Co., (3 John. Rep. 321,) has also been referred to by counsel. It settles that, if the goods be delivered in specie, however deteriorated, freight is earned.
In McGaw v. The Ocean Insurance Co., (23 Pick. 412,) when the case of Griswold v. The New York Insurance Company was first before the court, (1 John. Rep. 212,) Mr. Justice Livingston cogently argued against the right to abandon for freight; but we are to observe, that it was the case of goods greatly diminished in value, yet capable of being delivered in specie, which he was discussing.
Hor is there any thing decisive, upon this particular question, in the English law. Mr. Abbott, after citing the remarks of Valin, and of Pothier, observes, “ that the argument of the latter may show what ought to have been established, but it by no means proves that the interpretation given by Valin is not the true interpretation of the ordinance. The rule was probably introduced in *544 early times, to prevent disputes and litigation, and adopted by the framers of the French ordinance for the same reason.”
The supposed decision of Lord Mansfield, in Luke v. Lyle, (Barr. 886,) may.be considered as inaccurately reported, or not the law, if applied to a port of destination. Mr. Abbott concludes that, in point of practice, the right to abandon, for freight alone, is never claimed in England. Mr. Abbott is, obviously, of opinion that there is no general right of abandonment; but, in this particular case, he cites nothing more to the point, than the passage from Molloy I have before quoted.
In such a state of the law, in England and our own country, when there is, at best, but the opinion of eminent writers, and nothing of judicial authority, we are at liberty to resort to the foreign law for light and aid, if not for direction.
The whole subject is carefully examined, and the opinions of the eminent writers discussed, by Boulay Paty, (Droit Commercial, tome 2, p. 492.)
After stating the rule, that merchandise, delivered in specie, can not be abandoned for the freight, however much it may be deteriorated, he observes: But there is another case, in which the merchant may abandon his goods, for payment of the freight; it is where the casks, containing liquids, have leaked so much as that they are empty, or nearly empty. (Tome 2, p. 492.) He then cites the Guidon de la mer, which is express to this proposition, and enumerates molasses among the articles; also the Ordinance of the Marine of 1681, equally explicit, and the Code of Commerce, (article 810,) before cited.
He then speaks of the comments of Valin, and other writers, upon the inconsistency of permitting such an abandonment for liquids leaked out, and not allowing it for dry commodities which have diminished in value. That some of the jurisconsults have attributed this distinction to the greater probability, and, therefore, legal presumption, that liquids have leaked from the fault of the captain or crew. M. Loere gives this explanation; M. Valin does not find it satisfactory.
Pothietis comments on the ordinance are as follows: “ The casks in which liquids which have leaked have been contained, are but the accessories and coverings of the merchandise. The merchandise is the liquid contained in them. If the casks be *545 empty, the merchandise no longer exists, and the master has not transported it to its place of destination; nor, of course, fulfilled his obligation. The freighter may then abandon the casks and the remnants, and discharge himself. But, in the other case, the merchandise exists, however damaged. It has been transported, the engagement fulfilled, and the freight is due.” (Pothier, Charte-Partie, N. 60; M. Delvincourt, tome 2, p. 293.)
Again, Pothier, in discussing the question whether, in the case of some barrels nearly empty, and some full, the abandonment may be of the former only, or must be of all, speaks of the empty casks as perished merchandise; the barrels are lost when they are empty, or almost so. And another writer, M. Boucher, speaks of such a loss by leakage as the same thing as a loss by shipwreck.
Boulay Paty then examines the question, which he says has been greatly controverted, whether, if the leakage takes place without the fault of the captain, nor by superior force, nor by accident, but from the defect of the casks—their bad condition—the freighter shall be discharged of freight upon abandoning. Valin insists that the letter of the law makes no distinction; and even in this case, the abandonment may be made. M. Delvincourt supports the same opinion, on the ground that the captain was bound to assure himself of the good condition of the casks before he undertook to convey them.
Pothier opposes these views with great decision and strength of argument. M. Boulay Paty agrees fully with him, and adds this important practical proposition: “ So that if the captain proves, as well by experts as by witnesses, that the casks were in a bad condition at the time of the shipment, and that the leakage has been the inevitable result of this, he may demand his freight.”
The authors of The Dictionnaire de Droit Commercial, 1852, Gouget et Merger, state the rule thus: “ This article (310) is not ap plicable to the case of leakage arising from the bad condition of the casks. The freighter who does not enjoy his goods from his own fault, cannot be relieved from the price of conveying them. The captain is responsible for 'stowage, but not for the state of the casks.” They cite Pothier, Boulay Paty, Favard, Sebirne et Oar-bet, contra, Valin and Delvincourt, (vol. 3, p. 269.) Favard’s authority is found in his Dictionnaire Tit. Charte-Partie.
M. Boucher discusses this subject with much justice of reason *546 ing. “ A captain cannot prevent an article from perishing or being injured from its proper use. He is, therefore, paid his freight in such a case. But he is to be treated as able to prevent loss by a leakage, especially if he have declared that he received it in good order, by his bill of lading. We may, therefore, attribute a leakage to bad stowage, which he is bound to superintend. One hogshead leaks more than others from one of two causes: either from its worse condition, or from worse stowage. He is not at liberty to assert the former. The latter may not, indeed, be treated as actually proven; but; inasmuch as it is a just presumption, he is to be discharged from the loss, but obliged to take the cask and the remnant for his freight.” (Institution du Droit Maritime, Paris, 1803, p. 289.)
The authority of the Consolato del Mare is, perhaps, of more importance upon this point than any in the French Law. Mr. Duer observes, that “as early as the 11thcentury, and during a Succession of the years that followed, it was received and obeyed as law by all the nations of southern Europe. Indeed, unless a change has recently occurred, the rules of the Consolato have Still the force of law in the tribunals of Italy, and, I believe, of Spain.” (1 Duer on Ins., p. 37.)
The 202d: chapter of that treatise is as follows: “ Any ship-master whose vessel has been chartered by merchants, and about to be loaded with wine, he being obliged to furnish the merchants with hogsheads for the cargo of the ship, should proceed in the following way. He must cause the hogsheads to be cleaned and filled by his sailors, or by whomsoever he may choose, before placing them in his ship; and thus filled with water, he must show them- to the merchants, or to some person for them, and ask, or cause to be asked, of those merchants who are there, whether these hogsheads appear to them good! and sound, and whether they, wish that he should put them in his ship; and if they, the merchants, or person acting for them, say that they consider them good and reliable, and that he may put them, or cause them tobe put in the ship* then, if the merchants shall fill them, or cause them to be fillediwith wine,.after they shallbe stowed in the ship; and if then, any quantity of the wine which they shall put, or cause to be put in these hogsheads, shall escape,, or shall, be spilt, the master of the ship shall not- be held responsible, or obliged to make good the *547 loss, because it is not his fault; and still more, because he showed the casks to the merchants, filled with water, and with their consent, or that of the person acting for them, put them in the ship, they, or the person acting for them, having considered them in good condition, the merchants, therefore, are obliged to pay the full amount of freight which they had agreed upon, as well of the wine spilt as of that which shall remain, because it has not been spilt or lost through his fault. If, however, the master of the vessel being obliged to furnish the hogsheads, as above mentioned, and if neither he, nor any person acting for him, shall show them to the merchants, or to any person for them, and without their consent, or that of the person acting for them, shall put them, or cause them to be put in the ship, if the merchants shall sustain any loss, on account of these casks which shall not have been shown to them, the master of the vessel is bound to make good the loss, and the merchants shall not be obliged to pay the freight of the wine which shall have been lost, because the hogsheads were not shown to them, that they might decide whether they were good or not. If, however, the master of the ship shall not furnish, nor shall be obliged to furnish hogsheads for these merchants, who have chartered the ship, and the merchants shall have had hogsheads from which all or part of the wine may have been spilled, the merchants are obliged to pay the freight of all which they may have placed on the ship, according to that which they shall have agreed upon without dispute.” (Edition of Venice, 1806.)
The comment of Casaregis is as follows:—“Any vessel being chartered to carry wine, the master of that vessel, if he be obliged to provide the merchants with hogsheads or with casks, before loading them, should clean them, fill them with water, and show them to those by whom they are to be approved. In case they should be overturned, the loss will fall upon the merchants, and there will be due no more, nor less, to the master than the freight of all the wine, whether saved or lost. But the master not using the above-named precautions, should pay the loss; nor can he claim any thing but the freight of the wine saved. But this ceases when the merchants shall have provided the hogsheads themselves; they should, in that case, bear the loss themselves, and pay all the freight to the master, according to agreement.
*548 In relation to this chapter, read Il Targ. Juris. Marit. cap. 43, num. 5.
It appears to have been the custom in the Mediterranean, for the owner of the ship to supply casks in which the wine was shipped.
Thus the payment of freight depended upon the fact of who furnished the casks. If the ship-master, he was responsible for their good condition, and lost his freight in case of leakage; if it was the merchant, his was the duty to supply suitable casks, and he was bound to pay the freight.
It will be observed, that the French writers lay much stress upon the obligations imposed by the bill of lading; and the subject cannot be fully considered without adverting to the law as to those obligations.
The connaissement, or police de chargement as it is termed on the shores of the Mediterranean, is the bill of lading of the English law. M. Lescadlier, (Vocabulaire des Termes Maritimes,) thus translates it.
The French Code, as well as the old ordinance, prescribes the form of this instrument. It must express the nature and quantity as well as the species or qualities of the articles, the name of the ship’s consignee, master, price of the freight, places of departure and destination, and is to exhibit, in the margin, the marks and numbers of the articles to be transported, (Code de Commerce, art 281; Ordinance in Emerigon, p. 253, Meredith’s translation.) It then becomes legal evidence between the parties interested in the shipment, and between them and the insurers. (Ibid.)
The foreign writers point out the responsibility which such an instrument imposes upon the captain, and therefore upon the owners of the ship. In the language of Boulay Paty, the effect of the bill of lading obliges the captain who signs it, to deliver the merchandise of the same quality, of the same quantity, of the same kind, and in the same condition as he received it, except those losses which it suffers in the voyage by the perils of the sea without his fault. This guaranty, or admission, is indeed only as to the generic nature, exterior and apparent, of the articles. As if sugar is mentioned, it is necessary to deliver the same number of casks with the same marks as those specified. But the specific quality is not contracted for. (Vol. i, 408, 409; vol. ii., p. 308.)
Pothier also observes, that the bill of lading duly executed, *549 is an admitted proof of the quantity of goods laden on board the ship.
This rule of the French law does not appear to be more stringent than that which prevails under the English and American decisions. Thus it is stated in Bates v. Staunton, (1 Duer, 85):— “ The bill of lading, it is true, contains an admission of the ownership of the goods, and also an admission of their actual shipment, and of their sound condition. It appears, however, to be settled, that in neither of these cases does the admission operate as an estoppel. It is strong prima facie evidence of the truth of the facts to which it relates, but not conclusive.”
In Warden v. Greer, (6 Watt’s Penn. Rep. 424,) the court say: “ Some difficulty arose as to whether the owners could contradict the bill of leading. This is not generally permitted, but cases may occur in which it may be proved there was an imposition on the captain, or a mistake of both captain and consignor. Suppose he receive a barrel of cider instead of Madeira wine, it would seem his bill of lading would not, and ought not, to exclude him from proving this, whether it arose from mistake or fraud in the consignor. But it would unsettle every thing, to permit a captain to receipt a bill for one hundred barrels of molasses, and at fifteen hundred miles distance, prove by his hands, that the barrels were not half full, or to receipt for them as in good order, and prove that they were in so bad order as to leak a gallon or a quart an hour.”
To guard the master and owner against a liability so comprehensive and rigorous as the letter of the bill of lading imposed, the French merchants introduced clauses into that instrument, which were meant to restrict it, and which have received judicial interpretation. The phrases usually employed, are: ‘sans approuver,” or “ que dit éireP The import of them is, that the articles are thus represented by the merchant, not thus recognized and admitted by the master.
The captain thus relieves himself from any engagement as to the weight, measure, or quality of the goods; every thing, in short, which is interior. He does not discharge himself from liability for the number of bales, cases, or tons, (Boulay Paty, Droit Commercial, tome i., p. 408, 409.) Emerigon cites several *550 cases to illustrate the force of this clause. (Meredith’s Translation, p. 268.) A bill of lading was for a bag of pepper, weighing so much, with this clause. The captain was deemed not responsible for a deficiency of weight. And, in one case, when a barrel, stated to be filled with nutmegs, was found full of pieces of old iron, the captain was discharged.
But this clause does not relieve the captain from responsibility for the number of casks, bales, &c. He was held answerable, in one adjudication, for a missing bale of cotton, notwithstanding the clause. The effect of the clause is done away, if the captain needlessly open the bales or casks, during the voyage. And the clause cannot be effective, when the goods shipped belong, to the captain, who is the agent to purchase them. In short, the tenor of the French decisions and interpretations is, to limit the effect of the qualification in question, upon the general responsibility of the master, to a strict adherence to what the qualification relates to, and necessarily implies.
The bill of lading, in the case of Clark v. Barnwell, (12 Howard’s U. S. Rep. 283,) was similar to the one in the present case. It was in the usual form, but at the foot was the clause, “ Contents unknown.” The court said: “It is obvious, therefore, that the acknowledgment of the master, as to the condition of the goods— cotton-thread in boxes, inclosed in larger boxes—when received aboard, extended only to the external condition of the cases, excluding any implication as to quantity or quality of the article—■ the condition, when received onboard, or whether properly packed or not in the boxes,” (citing Abbott, 339,) Mr. Abbott says—“If there is any dispute as to the quantity or condition of the goods, or if the contents of casks or bales are unknown, the words of the bill of lading should be varied accordingly.” He proceeds to notice the French ordinance, and some of the writers on the subject. See also Flanders on Shipping, § 501.
It appears to me far from being clear, that the terms used in this bill of lading necessarily imply that it was unknown whether the casks contained molasses. For example, if an action was brought for the loss of these barrels of molasses, through the fault of the master, would not the production of the bill of lading be proof of the barrels having contained the article, leaving the quantity and value to be proven?
*551 Suppose these casks had been thrown overboard, whether in a case of general average or not, would not the bill of lading be proof of molasses being in the casks, and the average quantities of what was in those delivered, be evidence of the quantity, and the average value, of the value ?
The phrase, “ gauge unknown,” means, simply, that the capacity of the barrel was not verified; “contents unknown" may mean that the quantity of molasses in the casks was unknown, or that it was unknown whether there was molasses in them or not. The latter is, probably, the most natural meaning; yet, as it is repugnant to the general tenor of the instrument, I doubt if it must be taken as, necessarily, the true and only meaning. It may be regarded as protecting the party, in case of liability for loss, from the effect of an admission that the casks were full, deducible from the rest of the bill of lading, and, particularly, the clause in it, that the freight was to be paid at so much a gallon, gross gauge.
The result of our examination of the subject is this:—
The owner of liquids, or any articles, shipped in casks, of any description, is, in the first instance, chargeable with the duty of supplying proper ones, and would, presumptively, be responsible for a loss, arising from their insufficiency or defects.
The effect of an unqualified bill of lading is, to transfer this presumptive responsibility to the captain and owners of the vessel. They, therein, acknowledge the good condition of the casks, upon their reception on board, and engage to deliver them, and their contents, as described, in the same condition.
When the case presents nothing else, if the casks be delivered empty, or nearly so, and the actual cause of the leakage be unknown, or conjectural, the owners of the vessel lose their freight. They have not performed their engagement. A proportion of freight would also be lost, for any number of the casks delivered empty, as well as for any portion of the contents of any cask leaked out. The loss, in these cases, is legally attributable to the defect of stowage, or some cause over which the master had control, and for which he has engaged to be responsible.
As, however, a bill of lading, treated as a receipt, is not conclusive, it is open to the ship-owner, and master, to prove, explicitly, that the casks were, in fact, unsound, or badly made; and, in such *552 a case, the original responsibility of the owner, for their condition, is restored, and he is bound to pay the freight.
A bill of lading may be so qualified, as to avoid any acknowledgment of the good order of the casks, or the quality or quantity of the contents. Like the French phrases referred to, it may import only, that these matters are so represented. In such a case, the burden is thrown upon the shipper, to establish the truth of his statements: for example, upon a question of loss, to make the owner of the vessel responsible; and, upon a question of freight, if the casks be delivered, it would be earned, whatever might be their condition or their contents. In either case, explicit words should be used, to do away the obligations, which the interests of commerce have rigorously imposed, upon the masters and owners of vessels engaging to carry goods for hire.
In the present instance, we find it expressly stated, that all the barrels of molasses were well and properly stowed, and none of the molasses was lost by the perils of the sea, nor by any negligence, or want of care, on the part of the owners of the vessel, or their agents: but the waste or loss arose solely by, or in consequence of leakage, fermentation, or inherent waste.
Every cause of the leakage is, therefore, necessarily excluded, except the bad condition of the casks when shipped. The effect of the acknowledgment in the bill of lading is therefore removed by proof of the fact. The primary responsibility of the shipper for the soundness of the casks is reinstated, and the obligation to pay the freight becomes complete.
As to the effect of the phrase, “ Contents and gauge unknown,” used in this bill of lading, they cannot be considered as implying more than ignorance of the quantity or quality, not of the fact of there being molasses in the casks. The body of the bill of lading is an admission of this fact, not controlled by the added words. Besides, the admission in the case settles this point.
Judgment for the plaintiff, for the amount of the freight of the eight barrels.